**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**EMMA CYNTHIA CROWNOVER,**

> **Plaintiff,**

**vs.**                                        **Case No. 1:08cv244-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

> **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Emma Cynthia Crownover, applied for supplemental security income benefits.  Plaintiff was 49 years old at the time of the administrative hearing, has a limited 9th grade education, and has past relevant work making and selling chain saw

sculptures.  Plaintiff alleges disability due to subdural hematoma with craniotomy, epilepsy, loss of balance, vision and hearing problems, cognitive disorder, and anxiety disorder (post traumatic stress disorder).

The Administrative Law Judge found that Plaintiff has the residual functional capacity to perform simple, routine, medium exertional level work[1] with limitations.  With evidence from a vocational expert, he determined that Plaintiff could do work as a hand packager, agricultural produce packer, office helper, and clock or watch assembler.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

---

[1] 20 C.F.R. § 404.1567(c) provides:  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c) is identical.

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

The administrative hearing was held on May 22, 2008.  R. 272.  Plaintiff testified

that she injured her head in October, 1995.  R. 282.  She said that much earlier in her

life, she had fallen on stairs and bumped her head.  R. 284.  She said that when this

second injury occurred, she was not taken right away to the hospital, but when she

reached the hospital, the surgeon did a craniotomy to relieve the pressure of a subdural

hematoma.[2]  R. 282-283.

---

[2] While the testimony is not clear, the record reflects an injury when Plaintiff was 17
years old, falling down stairs, and an injury in 1995 causing a subdural hematoma.

Plaintiff said that she suffers from epilepsy and depression as a result of this accident.  R. 286.  She takes Celexa for depression.  *Id.*  She takes Keppra for seizures.  R. 289.  Her seizure medication comes in the mail to her to her from the Epilepsy Foundation.  R. 308.  She said that the medications make her drowsy.  R. 289.  Plaintiff said that she had had fewer grand mal[3] seizures taking Keppra.  R. 306.  She had not had a grand mal seizure during the day time since 1995.  R. 311.

Plaintiff said that she has small seizures, and said that she experiences "little lights dancing around and I can partially hear a conversation but I can't respond."  R. 302.  She said that during some seizures, "everything just kind of gets fuzzy."  *Id.*  Sometimes her leg will start kicking.  *Id.*  She had not had a grand mal seizure in months.  *Id.*  She did not think that any medically trained person had ever witness one of her seizures, however.  *Id.*  She said that she has a seizure "pretty much every day," and two or three times a day on some days.  R. 302-303.  These small seizures last two or three minutes.  R. 303.  After a seizure, she said she feels confused and light-headed.  *Id.*  She said it is hours, and sometimes half a day, before she feels right again.  R. 303-304.  She said she felt these effects from seizures several times a week.  R. 306.  She said she has difficulty concentrating on a task and her energy level is low.  R. 304.

Plaintiff testified that she had symptoms of depression, crying for no reason and having negative feelings.  R. 305.  Some days she does not want talk with anyone and turns the phone off.  *Id.*  She said she had two or three days like that a month.  *Id.*

---

[3] This is also known as a gran mal and more recently, a tonic-clonic seizure.

Plaintiff said that after her head injury, she had to learn "everything over."  R.

307.  She could not recognize people she had known for 20 years.  *Id.*  She said she

now forgets "people, places, directions."  *Id.*

Plaintiff said she has trouble walking a straight line, cannot stand on one leg, has

to watch every step, and cannot ride a bicycle.  R. 307.  She said that her right hand

and leg no longer work as well as before the accident, and she uses her left hand.  R.

308.

Plaintiff said that almost every day she takes a nap in the afternoon.  R. 300.

She said that she had sleep apnea and did not sleep well at night.  R. 300-301.  She

said that she had never been diagnosed with sleep apnea because she could not afford

to see a doctor.  R. 301.

Plaintiff testified that she had had yard sales on the first weekend of the month.

R. 280-281.  She said she can bathe and dress herself, but does not drive a motor

vehicle due to seizures.  R. 290.  She said she can dust and sweep her living room for

one-half hour, but said her back would hurt.  R. 291-292.  She said that she could stand

and wash dishes (a whole sink full) for one-half hour until her back begins to hurt.  R.

292.  She said she is able to do laundry and take out trash.  R. 293.  She did not like to

shop for groceries, and she got her daughter to do shop for her.  *Id.*  She works in a

small vegetable garden.  R. 294.  She is able to clean the bathroom.  R. 295.  She said:

"sometimes it seems like I'm busy all day and it doesn't look like anything has gotten

accomplished."  *Id.*  She watches less than an hour of television a day.  *Id.*  She has a

computer that she uses for emails and online news.  R. 295-296.  She visits with family,

sometimes staying over night.  R. 297.  She said that she had "so many projects going

on I haven't finished."  R. 298.  She had traveled by bus to visit family in Texas the

previous January.  R. 299.

The ALJ asked the vocational expert to consider a hypothetical individual who is

a younger person, age 49, with a 9th grade limited education, and no prior relevant

work, who is capable of doing work of a medium exertional level, but must avoid

balancing, one-legged movement, ropes, scaffolds, and ladders, prolonged (six hours or

more) exposure to hot and cold temperature or humidity extremes, flashing lights, or

video monitors.  R. 316.  The ALJ further limited the work to simple, routine work with

the use of a hearing aide.  R. 317.  The vocational expert said that such a person could

do work as a hand packer, agricultural packer, office helper, and assembler.  R. 317-

320.  The expert said that if such a person had a limitation that he or she was

unpredictably unable to concentrate for 15 to 30 minutes one to two times a day, this

limitation was rule out any form of employment.  R. 323.

**Medical evidence**[4]

On November 15, 2001, at age 43, Plaintiff was seen by Robin Gilmore, M.D., in

the Shands HealthCare neurology clinic.  R. 233, 228-230.  She told Dr. Gilmore that at

age 17, she fell down stairs and fractured her skull.  R. 228.  She suffered her first

---

[4] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS'
DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS
DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx.
Information about medical terms and prescription drugs come from DORLAND'S MEDICAL
DICTIONARY FOR HEALTH CONSUMERS, available at:  http://www.mercksource.com
(Medical Dictionary link).  Social Security Rulings can be found at:
http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these websites are
not attached to this report and recommendation as the information is relatively well-
settled, the precise definitions are not at issue in this case, and the definitions are not
likely to be in dispute.

seizure about six months later.  *Id.*  Then, in about 1994 at about age 36, she sustained a subdural hematoma after playing a game of bumping heads with an 11 year old.  *Id.* She had a craniotomy at Shands two or three days later to evacuate the hematoma.  *Id.* She was on Dilantin for one year without seizures, discontinued Dilantin, and began having "staring spells."  *Id.*  She had refused to take Dilantin at age 17 having read about side effects.  *Id.*  She was accompanied by a boyfriend, who said that she was having seizures "sometimes three times a week and then no seizure for some weeks whereas other weeks they may occur daily."  *Id.*  He said that the seizures lasted five to ten minutes, and after the seizures, Plaintiff was disoriented, tired, had a headache, and may sleep until the following day.  *Id.*  He said that the majority of her seizures occur shortly after she falls asleep.  *Id.*  Plaintiff also said she had visual changes, fuzzy white spots, and ringing in her ears.  *Id.*  Her friend said that she "can have major panic attacks after her seizures."  R. 229.

Plaintiff was then taking Neurontin,[5] but her friend said that many times she forgets to take her medication or decreases the amount that she takes.  R. 229.  The Neurontin was prescribed by her family care physician.  *Id.*  Plaintiff said that she smoked one and one-half packages of cigarettes a day, drank four to six beers a day, and occasionally smoked marijuana.  *Id.*  Neither Plaintiff nor her companion had a job. *Id.*

---

[5] Neurontin has two uses.  First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited).  It can be used whether or not the seizures eventually become general and result in loss of consciousness.  Second, it can be used to relieve the burning nerve pain that sometimes persists for months or even years after an attack of shingles (herpes zoster).  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On examination, Dr. Gilmore found that Plaintiff had full range of motion with no tenderness or swelling of joints, her spine was straight, and her gait was balanced. R. 230. She had problems in the left lower and right lower quadrants of her visual fields. *Id.* She could follow complex commands and had no right or left confusion. *Id.* The cerebellar examination (finger-to-nose, heel-to-shin, and alternating hand movements) was normal. *Id.* He said: "She had difficulty maintaining balance when walking on heels, on toes, and in tandem." *Id.* Her immediate and recent recall was "3/3." *Id.* She was alert, oriented times four, and her remote memory was intact. *Id.* Dr. Gilmore decided to increase the dosage of Neurontin. R. 230. He also started her on Celexa.[6] She was to return to the clinic for an EEG. *Id.*

On February 25, 2002, Plaintiff returned to Dr. Gilmore. R. 227. She had not maintained a careful seizure diary since he last saw her, on November 15, 2001. *Id.* She thought that she had from four to ten seizures since November 15, 2001. *Id.* Dr. Gilmore determined that Plaintiff's seizures were still uncontrolled, and he increased the dosage of Neurontin and Celexa. *Id.* Dr. Gilmore's examination of Plaintiff (cranial nerves, sensory and motor, deep tendon reflexes) produced normal results. *Id.*

On June 13, 2002, Plaintiff returned to Dr. Gilmore. R. 225. Plaintiff was still not keeping a seizure diary. *Id.* She said that in the intervening four months, she said that she had had about five to ten seizures and she felt that this was an improvement. *Id.* She said she had auras about once a week, and her seizures typically occurred during sleep. *Id.* She had been less depressed since her boyfriend had moved out, and her

---

[6] Celexa is used to treat major depression. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

18 year old daughter was living with her.  *Id.*  Dr. Gilmore noted that the EEG was "abnormal on the basis of potential epileptiform sharp transience noted at the right temporal TA greater than C4 region."  *Id.*  He said there did not appear to be a "breech rhythm."  *Id.*  On physical examination, Plaintiff's strength was equal bilaterally and symmetrically, her extraocular movements were intact, her tongue was midline, her gait was balanced, and her deep tendon reflexes were 2+/4.  *Id.*  He wanted to schedule Plaintiff for a brain MRI because he thought she might be a seizure surgery candidate.  R. 226.  He also referred her to Epilepsy Services of North Central Florida.  *Id.*  The plan was to continue with Neurontin, but to add Lamictal[7] if her seizures were not controlled with Neurontin.  R. 225-226.

On March 26, 2003, Plaintiff had an MRI of her head.  R. 233.  The impression was:

> Encephalomalacia defects likely from prior ischemic event in the cortical region of the left parietal lobe and mesial right occipital lobe which have progressed since the prior MR from 1995.  There is surround gliosis which may be the etiology for the patient's seizures.  No extra-axial fluid collection.

R. 234.

On April 28, 2005, Plaintiff was seen by Denise Y. Riley, A.R.N.P.  R. 223.  It was noted that she had "lost her Medicaid" and had applied for "Epilepsy services."  *Id.*  She noted that the EEG from February, 2002, showed "sharp discharges from the right temporal region."  *Id.*  She also noted the 2003 MRI findings, showing encephalomalacia in the left parietal and right occipital regions, and progression since

---

[7] Lamictal is prescribed to control seizures in people with epilepsy.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

1995.  *Id.*  Plaintiff said she was not taking Neurontin due to adverse side effects.  *Id.*
Plaintiff reported that she was having grand mal seizures in sleep once per week, and
distorted vision several times a day.  *Id.*  She had no history of mood swings, "although
she has been on Celexa in the past."  *Id.*  She denied use of alcohol but still smoked.
R. 223-224.  On examination, all test results (pupils, extraocular movements, finger-to-
nose, spelling backward and forwards, naming, speech, gait, memory, tongue
alignment, and smile) were normal.  R. 224.  Nurse Practitioner Riley began Keppra
with free samples in an effort to "get her therapeutic as quickly as we can."  *Id.*  Plaintiff
was to contact "Epilepsy Services" in the Department of Neurology to set up a
continuation of the medication (apparently at little cost to Plaintiff).  *Id.*  Nurse
Practitioner Riley's assessment was "intractable epilepsy."  *Id.*

     On November 14, 2005, Plaintiff returned to Nurse Practitioner Riley.  R. 221.  It
was reported that she had "lost her Medicaid coverage," and awaiting Patients
Assistance Program approval.  *Id.*  She was presently obtaining medication through free
samples, and had not yet provided the financial documentation to allow her to obtain her
medication, Keppra, through the Patients Assistance Program.  *Id.*  She was informed
that free samples could no longer be provided, and she had to obtain her medication
from the Dixie County Department of Health, though there was hope that she would be
approved by the Patients Assistance Program.  *Id.*  Nurse Practitioner Riley said that
"Keppra seems to have controlled her seizures right from the start.  Unfortunately she
had to cut back on her dose due to the decreased amount of medication on hand."  *Id.*
Her seizures had increased to two to three times a week "out of sleep" and she also
experienced "daily auras described as sparkling visual patterns."  R. 222.  Her

examination was normal.  *Id.*  She was encouraged to again apply for Medicaid due to

her abnormal MRI of 2003.  *Id.*  Plaintiff was scheduled to return to the clinic in six

weeks.  *Id.*

On June 14, 2006, Plaintiff completed a disability report.  R. 101-106.  She said

she could not work because she had no balance, did not have full use of her right hand,

dragged her right leg, did not recognize people, and could not remember directions.  R.

101.  She said that she experienced sleepiness and clumsiness from taking Keppra,

and had no side effects from Celexa.  R. 105.

On August 24, 2006, Plaintiff filed out a function report.  R. 107.  She said she

did the dishes, prepared her meals, cared for pets, tended to her personal hygiene, and

took her medicines.  R. 107-109.  She did not like to shop, but did so when friends took

her.  R. 110.  She said that when people visited, she talked, laughed, and fished

sometimes, and she did these things whenever possible.  R. 111.  She went to the

doctor and to an occasional cookout or birthday party.  *Id.*  She said she could not

remember people or directions to places.  R. 112.  She said she did not follow

instructions well.  *Id.*  She said she no longer had patience when she was in a doctor's

office, in stores, or with children.  R. 114.  She said she gets claustrophobia easily, and

cannot stand on one leg or walk a straight line due to a lack of equilibrium.  *Id.*

On August 29, 2006, Plaintiff completed a pain questionnaire.  R. 123.  She said

that pain starts in her right hip and goes to the knee and down the leg to her foot, and

awakens her at night.  *Id.*  She said that the pain is caused by bending over the sink to

wash dishes, and sweeping the floors.  *Id.*  She said she could not afford to go to the

doctor and therefore had no side effects from medication.  *Id.*  She took only aspirin.  *Id.*

She said she had slow cognition and early dementia.  R. 125.  She said one of her

doctors told her she could work 20 hours a week "if I could handle the schedule."  R.

126.  She said it had taken her a long time to fill out the pain questionnaire.  *Id.*  She

said that she had had fewer seizures since her dosage had increased.  R. 127.

On August 31, 2006, Plaintiff returned to Nurse Practitioner Riley.  R. 219.  She

had last been seen on November 15, 2005.  *Id.*  On May 15, 2006, she had seen the

program director of Epilepsy Services of North Central Florida and since then, she had

been taking Keppra daily.  *Id.*  She said she continued to have "auras described as

sparkles in her vision, fogginess, stomach sensations and a feeling of not quite being

there.  She also continues having grand mal seizures out of sleep," but her seizures had

decreased in frequency.  *Id.*  The dosage of Keppra had been "broken up" due to side

effects of grogginess.  *Id.*  Plaintiff reported continued feelings of depression, and asked

for a change in the dosage of Celexa.  *Id.*  Plaintiff's daughter, who had been her main

helper, had moved to Texas.  *Id.*  The physical examination was normal.  *Id.*  Her

immediate and recent recall was normal.  *Id.*  She had a balanced gait.  R. 220.  The

assessment again was intractable epilepsy.  *Id.*  An increase in Keppra was prescribed,

but the level of Celexa was unchanged.  *Id.*  She was advised to minimize caffeinated

drinks to help her sleep cycle and minimize "out of sleep" seizures.  *Id.*

On October 12, 2006, Plaintiff was examined by Lance I. Chodosh, M.D., a family

and occupational medicine practitioner.  R. 149.  He found that she presented "an

imprecise history."  *Id.*  She told Dr. Chodosh that she had loss of hearing in the right

ear from her first accident, chronic loss of balance, seizures for at least 11 years,

clumsiness with her right hand "at times," problems with balance, and problems with

memory.  *Id.*  She described her right hip pain as intermittent and variable.  *Id.*  She told

Dr. Chodosh that she was independent in activities of daily living, could walk normally

for about one-half mile, but could not stand for long.  R. 150.  She reported past

alcoholism with cessation 8 to 10 years earlier.  *Id.*  Dr. Chodosh found Plaintiff to be

fully oriented, had normal speech pattern, had appropriate thought content, and was

cooperative.  *Id.*  He thought that her hearing was "not severely impaired, and there is

no difficulty communicating."  *Id.*  She had normal eye movements.  *Id.*  All of Plaintiff's

joints had full range of motion, she had no tenderness or paraspinal muscle spasm, and

straight leg raising was negative bilaterally.  R. 151.  Her cranial nerves were intact,

motor function was grossly normal, and strength was 5/5 in all four extremities.  *Id.*  Her

manual dexterity and coordination was good.  *Id.*  Her balance was judged to be only

fair, but her gait was normal and she was able to walk unsteadily on toes.  *Id.*  Dr.

Chodosh concluded:

> It is my opinion, based only on objective evidence, that this person is able
> to stand and walk normally.  She can sit, stoop, squat, and kneel.  She
> can lift and carry moderate loads, and can handle objects.  She can see
> normally.  She has adequate hearing, and can speak normally.  She
> should not drive, nor should she work at heights, or around hazardous
> machinery.

R. 152.

On October 23, 2006, Plaintiff had a psychological evaluation on a consultative

basis by Linda Abeles, Ph.D., a licensed psychologist.  R. 165.  Dr. Abeles said there

were no obvious impairments of her vision, hearing, or speech, but her "cognition

abilities were clearly slowed and she tended to be tangential."  R. 166.  She was found

to be oriented in all four spheres and, said Dr. Abeles, was probably functioning in the

high average range of intelligence.  *Id.*  She had some deficits in her immediate

memory.  *Id.*  Her judgment was deemed to be impulsive.  *Id.*  She was anxious about

her boyfriend's threats upon her life and she said she experienced depression along

with crying spells.  *Id.*  She reported repeated domestic violence.  R. 167.  She reported

having been sexually abused by her stepfather and she left school in ninth grade.  R.

165.  Dr. Abeles wrote: "Her current level of psychological functioning would preclude

her from obtaining or maintaining employment in that her cognitive abilities appear

slowed to the point that she would have difficulty in consistently performing work-related

duties."  R. 167.  She was thought to be competent to manage her money.  *Id.*  Dr.

Abeles's diagnosis on Axis I was cognitive disorder NOS and post traumatic stress

disorder acute.  R. 166.  On Axis II her diagnosis was dependent personality disorder

traits.  *Id.*  On Axis V she assigned a current GAF of 60.[8]  *Id.*

On February 15, 2007, Plaintiff was seen by Stephan Eisenschenk, M.D., in the

Shands Neurology Clinic.  R. 215.  Plaintiff said that she continued to have seizures,

with the last seizure a year earlier, in February, 2006, while sleeping.  *Id.*  She said she

also continued to have "episodes in which she has 'sparkling lights' that occur one to

two times per week."  *Id.*  Plaintiff had substantially decreased her intake of cigarettes

and caffeine.  *Id.*  Plaintiff thought that Keppra had helped control her seizures.  *Id.*  She

---

[8] "The GAF scale reports a 'clinician's assessment of the individual's overall level of
functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of
Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir.
2002).  A GAF score of 51-60 indicates:  "Moderate symptoms ( e.g., flat affect and
circumstantial speech, occasional panic attacks ) OR moderate difficulty in social,
occupational, or school functioning ( e.g., few friends, conflicts with peers or co-
workers).  *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

felt she had some problems with depression.  *Id.*  Dr. Eisenschenk said that Plaintiff was

on the Patient Assistance Program already, and he would "not increase her regimen

because she is at maximum dosing level supplied by the companies."  *Id.*  He decided

to initiate another anti-epileptic, Lamictal, "that may help not only with her seizure

disorder but also her depression."  *Id.*  This change was sent to the Patient Assistance

Program.  *Id.*  Plaintiff was to return in six months.  *Id.*  Plaintiff did not want to begin this

medication with samples, and it was anticipated it would take six to eight weeks using

medication from the Patient Assistance Program to get her "up to therapeutic dose."  R.

216.

On February 22, 2007, a state disability services worker called Plaintiff to find out

why she had not filled out the seizure form to provide information as to the number of

seizures she was then experiencing.  R. 130.  The worker said that the last time the

worker talked with Plaintiff, she would not answer the questions.  *Id.*  Plaintiff said she

did not know how many seizures she has in a month.  *Id.*

On October 8, 2007, Plaintiff returned to Nurse Practitioner Riley.  R. 213.  She

said that Plaintiff continued to suffer intractable epilepsy.  *Id.*  She had increased her

nighttime dose of Keppra, but showed no improvement.  *Id.*  Nurse Practitioner Riley

said that Plaintiff "did not initiate the Lamictal she was instructed to last time [February

15, 2007] because she did not turn in her patient assistance program forms."  *Id.*  She

noted that Plaintiff also ran out of Celexa because she did not resubmit her application.

*Id.*  Nurse Practitioner Riley said: "This has been a consistent problem with the patient.

Although we know she has problems with memory due to a head injury, she seemed to

lack the initiative to take on some responsibility for her care."  *Id.*  The examination was

normal.  R. 214.  Her gait was balanced, she had undiminished strength, and she was

alert and oriented.  *Id.*  A referral for a new brain MRI was also made.  *Id.*  Plaintiff was

to return in six months.  *Id.*

**Legal analysis**

> **Whether the ALJ erred by failing to attach a psychiatric review technique form to his decision and whether he erred in failing to assess whether Plaintiff's condition met or equaled the requirements of Listing 12.06**

Plaintiff contends that the ALJ erred by failing to attach a psychiatric review

technique form (PRTF) to his decision.  Doc. 12, p. 11 on ECF (electronic case filing

docket).[9]

> This technique requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. § 404.1520a-(c)(3-4).  The ALJ is required to incorporate the results of this  technique into the findings and conclusions. 20 C.F.R. § 404.1520a-(e)(2).

Moore v. Barnhart, 405 F.3d 1208, 1213-1214 (11th Cir. (2005).  "[W[here a claimant

has presented a colorable claim of mental impairment, the social security regulations

require the ALJ to complete a PRTF and append it to the decision, *or* incorporate its

mode of analysis into his findings and conclusions."  *Id.*, at 1214 (emphasis added).

In this case, the ALJ complied with these requirements.  He incorporated all of

the required analysis and findings into his decision.  R. 19-20.  This initial argument is

without merit.

---

[9] The page numbers of Plaintiff's memorandum do not correspond with the page numbers assigned on ECF.  I have used instead the ECF page numbers for Plaintiff's memorandum.

Plaintiff also argues that her anxiety disorder, which Plaintiff also refers to post traumatic stress disorder, should have been evaluated under Listing 12.06, which concerns anxiety related disorders.  Doc. 12, p. 11 on ECF.  Plaintiff acknowledges that the ALJ considered her mental impairment under Listing 12.02, which governs organic mental disorder.   *Id.*

The Commissioner's rules provide that if the claimant has an impairment that is listed in or equal to an impairment listed in Appendix 1, Subpart P, following 20 C.F.R. § 1599, then a finding of disability will be made at Step 3 without considering the claimant's age, education, and work experience.  20 C.F.R. § 1520(d).  "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.' "  Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990) (emphasis by the Court).  A claimant is entitled to benefits if it is shown that his or her limitations meet, or are medically or functionally equal to, the limitations set forth in the Listing.  Shinn ex rel. Shin v. Commissioner, 319 F.3d 1276, 1282 (11th Cir. 2004).

The claimant has the burden of proving that his or her impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria.  Sullivan v. Zebley, 493 U.S. at 530, 110 S.Ct. at 891.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests

only some of those criteria, no matter how severely, does not qualify." *Id.* (emphasis by the Court).

> In order to equal a listing, the medical findings must be at least equal in severity and duration to the listed findings.  If a claimant has more than one impairment and none of his impairments meet or equal a listed impairment, the Secretary reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination of impairments is medically equal to any listed impairment. 20 C.F.R. 416.926(a).  When deciding medical equivalence, the Secretary must consider the medical opinion of one or more designated physicians on an advisory basis.  *Id.*, at § 416.926(b).  When a claimant contends that he has an impairment meeting the listed impairments, the burden is on the claimant to present specific medical findings that meet the various tests listed under the description of the applicable impairment, or, if in the alternative, he contends that he has an impairment which is equal to one of the listed impairments, the claimant must present evidence which describes how the impairment has such an equivalency.  *Bell v. Bowen*, 796 F.2d 1350, 1353 (11th Cir.1986) (Appendix A).

Wilkinson on behalf of Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987).

Listing 12.06 requires proof, among other things, that a claimant's anxiety disorder has resulted in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  Alternatively, there must be proof that the anxiety disorder has resulted in a complete inability to function independently outside the area of one's home.

Plaintiff has not met this burden of proof.  In her memorandum, Plaintiff did not identify any evidence that should have resulted in finding that Plaintiff's anxiety disorder met or equaled Listing 12.06.  The second argument is without merit.

**Whether the ALJ failed to give proper weight to the opinions of treating physicians and consulting physicians, misconstrued evidence concerning the consultative examination by Dr. Abeles, failed to properly evaluate the credibility of Plaintiff's testimony, and failed to pose a compete hypothetical to the vocational expert**

Arguments two, three, and four set forth in Plaintiff's memorandum are interconnected, as Defendant has observed, and all concern the question whether the ALJ properly determined Plaintiff's residual functional capacity.  Doc. 15, p. 14.[10]  The central issue is whether Plaintiff suffers from uncontrollable seizures to such an extent that her residual functional capacity, primarily her ability to concentrate, persist, and stay on pace, is sufficient to do work on a sustained basis, eight hours a day, 40 hours a week.

Residual functional capacity must be determined by the Commissioner at step four if the Commissioner cannot determine whether the claimant can do his past relevant work based upon "current work activity or on medical facts alone."  20 C.F.R. § 416.920; Davis v. Shalala, 985 F.2d 528, 532 (11th Cir. 1993).  "It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  "In order for a VE's [vocational expert's] testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002) (citation omitted).

------------------------

[10] The page numbers of Defendant's memorandum correspond with the page numbers assigned on ECF.

Dr. Abeles said that Plaintiff's "current level of psychological functioning would preclude her from obtaining or maintaining employment in that her cognitive abilities appear slowed to the point that she would have difficulty in consistently performing work-related duties."  R. 167.  Dr. Abeles said that Plaintiff's "cognition abilities were clearly slowed and she tended to be tangential."  R. 166.  She also diagnosed Plaintiff as having acute post traumatic stress disorder.  *Id.*

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  However, a consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).  Dr. Abeles did not have a treating relationship with Plaintiff.  Thus, the ALJ was not required to give considerable weight to the opinion of Dr. Abeles.

Still, the opinion of Dr. Abeles was a medical opinion that the ALJ was required to consider.  The ALJ determined that Dr. Abeles did not administer any psychological tests as a reason to discount her opinions.  R. 25.  He reasoned:  "She opined that the claimant had some deficits in immediate memory as the claimant had difficulty in repeating five numbers forward, a clinical observation which could be easily manipulated by poor effort."  *Id.*  He further reasoned that Dr. Abeles "based her conclusion predominately – if not exclusively – upon the claimant's self-reported symptoms, with no reality testing or psychological testing performed."  *Id.*  He thought that "the claimant's own reports of activities of daily living would not preclude the ability to perform unskilled work."  *Id.*

Plaintiff argues that the ALJ misconstrued the evidence with respect to the opinion of Dr. Abeles.  Doc. 12, p. 15 on ECF.  Plaintiff points out that Dr. Abeles said that Plaintiff "was clinically interviewed and was administered a mental status examination," and "documentation provided by ODD including medical records were reviewed in preparation of this report."  R. 165.  The only two "psychological tests" mentioned by Dr. Abeles, however, was to require Plaintiff to repeat five numbers forward and to answer a question: "What is the thing to do if while at the movies you are the first person to see a fire?"  R. 166.  Dr. Abeles did not mention any standardized psychological testing.  The notations under the heading "Clinical Impressions" appear to derive solely from the "clinical interview."  *Id.*  Indeed, Dr. Abeles determined that Plaintiff was probably functioning in the high average range of intelligence, R. 166, but did not make any reference to the results or scores from a standardized intelligence test to justify this finding.   Further, given the findings to be discussed ahead concerning Plaintiff's credibility, it was not error for the ALJ to reason that Plaintiff could have manipulated Dr. Abeles's findings by poor effort.  Moreover, Plaintiff's cognitive abilities were repeatedly tested in much the same way by treating physicians discussed above, and no significant deficits were noted in her cognitive abilities.  On November 15, 2001, Dr. Gilmore found that Plaintiff could follow complex commands and had no right or left confusion, her immediate and recent recall was "3/3," she was alert, oriented times four, and her remote memory was intact.  R. 230.   On February 25, 2002, Dr. Gilmore's examination of Plaintiff (cranial nerves, sensory and motor, deep tendon reflexes) produced normal results.  R. 227.  On April 28, 2005, and on November 14, 2005, Advanced Registered Nurse Practitioner Riley examined Plaintiff and all test results

(pupils, extraocular movements, finger-to-nose, spelling backward and forwards,

naming, speech, gait, memory, tongue alignment, and smile) were normal.  R. 224, 222.

On August 31, 2006, Nurse Practitioner Riley determined that Plaintiff's immediate and

recent recall was normal, and her physical examination was normal.  R. 219.  On

October 8, 2007, Nurse Practitioner Riley again examined Plaintiff with normal results.

R. 214.  Her gait was balanced, she had undiminished strength, and she was alert and

oriented.  *Id.*  No treating physician found Plaintiff's cognitive abilities to be "clearly

slowed."  The ALJ's reasons for discounting the opinion of Dr. Abeles are supported by

substantial evidence in the record.  Plaintiff's argument that the ALJ improperly

discounted Dr. Abeles's opinion as to Plaintiff's cognitive abilities is unpersuasive.

Finally, as will be discussed ahead, the ALJ acknowledged that there was some

evidence of slower thought processes, and he accounted for this in his residual

functional capacity determination, limiting Plaintiff to "simple, routine tasks and simple,

work-related decisions."  R. 21.

Plaintiff also argues that the ALJ failed to give proper weight to the opinions of

various treating physicians, that Plaintiff's seizures were not controlled and were

"intractable."  Doc. 12, p. 13 on ECF.  Plaintiff notes that the objective findings show

significant brain damage that reasonably could produce uncontrolled seizures.  *Id.*  In

this same section in Plaintiff's memorandum, Plaintiff argues that the ALJ failed to credit

her testimony that she continues to have frequent smaller seizures that cause her to

feel nauseated, experience visual problems (lights dancing around), confusion, difficulty

concentrating, loss of memory, and severe headaches.  *Id.*, p. 14.  Plaintiff argues that

the ALJ erred when he failed to include these limitations in his residual functional capacity determination and the hypothetical to the vocational expert.  *Id.*, p. 17.

It is here that the central issue in this case is to be decided.  This court's role is not to independently decide the issues, but to determine whether the ALJ correctly followed the law and whether his conclusions are supported by substantial evidence in the record.

Had the ALJ fully credited Plaintiff's testimony,[11] he would have found her to be disabled based upon her testimony as to the frequency and severity of her seizures.  The ALJ first conducted his discussion of the frequency and severity of Plaintiff's experience of seizures when he made his step 3 findings.  R. 18-21.  At step 4, the ALJ wrote:

------

[11]   Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for disregarding the claimant's subjective pain or symptom testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

The claimant originally alleged severely limiting impairments, mainly secondary to head injury. The claimant reported having no balance, less than full use of her right hand, a dragging right leg, and severe memory problems with inability to recognize people or remember directions to relatives' homes. However, these reports of allege symptoms appear to be exaggerated when compared to the objective medical evidence and the claimant's reported complaints to her treating sources. As stated previously, there is no objective evidence which documents the claimant as having no balance, less than full use of her hand, or a dragging right leg. Moreover, although there is some evidence of a slowing of the claimant's thought processes, it is not of a severity as alleged. The claimant did not even report problems with recognizing people or remembering directions to her treating sources which one would reasonably expect if an individual were experiencing such severe symptoms. Additionally, there is no evidence that her treating sources referred the claimant for formal mental health treatment or that the claimant herself pursued treatment for this allegedly severe memory deficit, indicative that the claimant's allege memory deficits were not as severe as she alleges. Moreover, the claimant apparently lived alone without any outside assistance for much of the relevant period, again indicating much less severe difficulties than she has alleged.

R. 21-22 (citations to the record omitted). The ALJ found that Plaintiff had some difficult

in maintaining balance, and added that to his residual functional capacity determination.

*Id.*

With respect to seizures, the ALJ found:

In regards to her seizure disorder, although she is prescribed antiepileptic medications, the record reveals that the claimant is not compliant with treatment. The claimant has not maintained a seizure diary, self-discontinued some medications, deferred initiating medication treatment, and was not even motivated to pursue help with her medications by providing financial information and filing forms as required. The objective diagnostic test results do not support the claimant's allegations of increasing seizure activity or even of her allegations of grand mal seizures occurring while sleeping. The findings on electroencephalogram (EEG) in 2002 show equivocal results. The diagnostic impression is of a "probably abnormal EEG on the basis of potentially epileptiform sharp transients noted at the right temporal." (Emphasis added.) The neurologist commented that although the claimant was status post craniotomy on the right, "this activity does not appear to be a breech rhythm." A later brain scan in 2007 resulted in stable findings of encephalomalacia with no acute

intracranial changes.  Furthermore, it was noted that no specific structural
lesion was evident as a focal source for the clinical epilepsy.  Additionally,
it must be considered that the claimant's alleged seizure activity has never
been witnessed by any medically trained personnel and her report of
seizure activity to the State agency is vague with reports that "I don't time
them or keep track of them."  There is evidence that the claimant has
reported improvement in symptoms when somewhat compliant with
medication.  Her treating source even remarks that the claimant's seizures
were controlled on Keppra right from the start.

R. 22 (citations to the record omitted).

> The ALJ also discounted Plaintiff's testimony based upon the daily activities she
described.  R. 22.  He noted that she was able to do housework, maintain a vegetable
garden, play games on the computer, read, and crochet.  *Id.*

> This reasoning is supported by substantial evidence in the record.  While the
treating sources occasionally found Plaintiff's balance to be impaired, and the ALJ so
found, on other occasions it was found that her gait and balance were not impaired.
There was no objective finding by a treating source that Plaintiff does not have the full
use of her right hand, or that she drags her right leg.  The treating sources examined
Plaintiff a number of times, and surely these findings would have been made had
Plaintiff been so impaired.  At no point did a treating source find Plaintiff's gait to be
impaired by a dragging right leg.  That those findings are not in the medical record to
support Plaintiff's testimony is a substantial reason to find that Plaintiff exaggerated her
impairments.

> Likewise, there is no finding by a treating source that Plaintiff's cognition is
significantly slower than normal, that Plaintiff has trouble with short term or recent
memory, or that Plaintiff has difficult remembering people and directions.  Plaintiff's
condition was checked on each visit to the treating sources, but the findings for memory

and cognition were consistently normal.  This is substantial evidence to discount Plaintiff's testimony.

The findings regarding Plaintiff's credibility in describing the frequency and severity of her seizures are likewise supported by substantial evidence in the record. Plaintiff did not keep a seizure diary as requested by her treating source.  This is important as her seizures were never witnessed or recorded by a treating source.  This, of course, may be due to the fact that Plaintiff visited a treating source only about twice a year, but the failure to keep a diary is important evidence that the ALJ reasonably relied upon in judging her credibility.  Further, Plaintiff was vague when asked to remember the frequency and severity of her seizures.  She was not motivated to obtain medications, and repeatedly failed to fill out the forms necessary to obtain her seizure medication with little cost, causing her to be without sufficient dosage, and she altered her dosage on her own.[12]  Her treating source did find that Keppra was helpful in controlling her seizures.

Finally, Plaintiff did describe rather full and varied daily activities that seem to be inconsistent with the degree of disability she described in her testimony.  In addition to the activities mentioned by the ALJ, Plaintiff said that she cared for pets, tended to her personal needs, held yard sales, and occasionally went fishing and to cookouts. Standing alone Plaintiff's daily activities might not be a basis to find that she can work

---

[12] "The regulations provide that refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability.  See 20 C.F.R. § 416.930(b).  " 'A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.' "  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988), quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987).  Here, however, Plaintiff's noncompliance is simply reasonable evidence going to her credibility as it shows that she was unreliable in matters directly concerning the need to treat her impairment.

fulltime in a competitive environment,[13] but with the other evidence, this is substantial

evidence to discount Plaintiff's testimony as to the degree of her symptoms when

considered with all of the other evidence.

Plaintiff argues that since Dr. Abeles found that she suffered from post traumatic

stress disorder, the ALJ erred in not considering the limitations imposed by anxiety in

his residual functional capacity determination.  As Defendant notes, however, Dr.

Abeles said only that Plaintiff "would appear to meet" the diagnostic criteria for post

traumatic stress disorder.  R. 167.  Dr. Abeles apparently based this upon the finding

that Plaintiff "has been the victim of domestic violence in her relationships and has been

repeatedly threatened with death by her most recent boyfriend."  Id.  There was also a

report that Plaintiff had been sexually abused by her step-father as a child.  Id.

Certainly these significant traumatic events could be a cause of post traumatic stress

disorder.  As noted above, the ALJ discounted Dr. Abeles's diagnosis because it was

based only on Plaintiff's subjective complaints.  Rejection of a tentative diagnosis of

post traumatic stress disorder for that reason is not sound, however.  Unlike a finding of

a cognitive deficit, a condition which is usually revealed through standardized objective

testing, a diagnosis of anxiety arising from post traumatic stress disorder will predictably

be based upon the patient's subjectively related history of trauma.  Had Plaintiff had a

---

[13] Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians.").

lengthy history of treatment for anxiety arising from prior traumatic events, perhaps another result would be recommended.  But here, there is only a one-time evaluation and only a tentative diagnosis.  The ALJ was entitled to give little deference to the opinion of a one-time examining psychologist, especially since none of the treating sources made any findings of significant chronic anxiety, or treated Plaintiff for chronic anxiety.

Plaintiff argues that the ALJ erred in failing to give substantial weight to the opinion of various treating sources that she has "intractable" epilepsy.  This phrase only indicates that the treating sources have had difficulty controlling Plaintiff's seizures.  In significant part, as the treating sources said, the difficulty in controlling the seizures is because Plaintiff did not comply with the recommendations of treating sources, to keep a seizure diary, to send in the forms needed to obtain her medications with little cost, and to take her medications as prescribed.  Thus, on this record it is unknown to what extent Plaintiff's seizures could be controlled if she fully complied with her medication regimen.  The notation by the treating sources, therefore, that her epilepsy is "intractable," had little weight to be given as it did not clearly indicate the degree of impairment Plaintiff might still have were she to be fully compliant with her prescribed treatment.

In summary, the several arguments presented by Plaintiff to show error in the ALJ's determination of her residual functional capacity are unpersuasive.  The ALJ correctly followed the law in determining Plaintiff's residual functional capacity, and his finding is supported by substantial evidence in the record.  Thus, he posed a correct hypothetical to the vocational expert.

**Whether the Appeals Council erred in failing to remand to the ALJ to consider newly submitted evidence**

After the administrative hearing, Plaintiff asserts that she tried to submit new evidence for consideration by the Appeals Council.  Plaintiff asserts that the new evidence, a medical record from treating physician Dr. Eisenschenk, was submitted to the Appeals Counsel as an attachment to her request for a hearing.  Doc. 12, p. 18 on ECF, citing R. 10.  The "Request for Review of Hearing Decision/Order," form HA-520-U5, is dated and signed on September 4, 2008.  R. 10.  It references an "attached addendum."  *Id.*  There is no addendum attached to this one page document in this record.  The Appeals Council entered an order on September 24, 2008, noting that it had received a letter from Plaintiff's attorney dated September 4, 2008, "with Form HA-520-U5 attached."  R. 9.  The letter was assigned Exhibit AC-1 by the Appeals Council. *Id.*  The letter now appears in the record at R. 267.  There is no reference to a medical record from Dr. Eisenschenk in any of these documents.  R. 9, 10, 267.

The new evidence is a letter from Dr. Eisenschenk dated October 6, 2008, a month after Plaintiff signed and submitted her "Request for Review of Hearing Decision/Order," form HA-520-U5.  In the letter, Dr. Eisenschenk states:  "*Today*, the patient tells us that she needs a letter for Social Security Disability."  Doc. 12-2 on ECF, p. 1 (emphasis added).

The ALJ's decision is dated July 18, 2008, yet Plaintiff did not seek Dr. Eisenschenk's more current opinion until October 6, 2008, nearly three months later, and not until a month after her lawyer had filed his request for review by the Appeals

Council.[14]  The opinion of Dr. Eisenschenk could not have been attached to request for Appeals Council review since it did not exist until a month later.

Therefore, the Appeals Council did not commit error in failing to consider evidence it never had.  "When no new evidence is presented to the Appeals Council and it denies review, then the administrative law judge's decision is necessarily reviewed as the final decision of the Commissioner . . . ."  Ingram v. Commissioner of Social Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

It has not gone unnoticed that Dr. Eisenschenk believes that Plaintiff is now suffering from increased seizure frequency and somnolence from her medication, and states that he considers her to be "cognitively impaired" and "medically disabled."  Doc. 12-2 on ECF, pp. 1-2.  Assuredly this is important new evidence from Plaintiff's treating physician.  But this evidence was never in the administrative record and it cannot be considered now by this court with respect to this application for supplemental security income benefits.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and were based upon substantial evidence in the record.  The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

---

[14] The request for review had to have been received by the Appeals Council before October 6, 2008, because the Appeals Council entered its order on September 24, 2008, acknowledging that the request for review had been filed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on June 11, 2009.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**